EVELYN V. KEYES, Justice,
dissenting.
I respectfully dissent. This is a simple medical negligence case in which a patient recovered damages for physical pain and suffering, mental anguish, and lost earnings against her gynecological surgeon for *713 professional negligence in performing her laparoscopic-assisted vaginal hysterectomy (“LAVH”).- Yet the majority takes an element of the proof of professional negligence — the defendant-surgeon’s failure to tell the patient that he was turning over half of her surgery to an unqualified co-surgeon he was supervising — and turns this fact into an unpled and invalid theory of recovery, not submitted to the jury, but on which the majority presumes damages to have been awarded anyway.
The majority concludes that the unpled theory of recovery arose from the Texas Supreme Court’s decision in Felton v. Lovett,[1] which defines the scope of a physician’s duty to disclose the risks of medical procedures under the Medical Liability Act (“MLA”), and it reforms the plaintiffs general negligence case to include it.' It further concludes that this theory of recovery is entirely separate from professional negligence, that evidence of failure to disclose the use of an unqualified co-surgeon is not evidence of professional negligence, and that this evidence cannot be used to show that a physician committed professional negligence. Finally, it determines that the trial court’s failure to submit this invalid theory of recovery to the jury, and its failure to instruct the jury to disregard-the evidence of what the defendant physician told the patient, is reversible error because it allowed the jury to award damages based solely or primarily on the invalid theory of recovery of damages in violation of Crown Life Insurance Co v. Casteel.[2] Therefore, it orders that the case be remanded to be retried without the invalid theory that was neither pled nor submitted to the jury. It also orders that the case be retried (1) without evidence that the defendant surgeon failed to tell his patient that he would be turning over the surgery on one side of her body to an unqualified resident physician he was supervising who had never done an LAVH and (2) without expert testimony that failure to disclose the use of an unqualified co-surgeon is a breach of a surgeon’s standard of care.
In my view, the majority finds jury charge error where there was none; finds that the alleged error was preserved when it. was not; mistakenly .confuses evidence of medical negligence with a separate cause of action; misapprehends and misconstrues the plaintiffs case; misapplies the Texas Supreme Court’s holding in Fel-ton, creating and injecting into the case a new theory of liability which it acknowledges is both invalid and unpled; greatly expands the concept of jury charge error requiring reversal of a judgment for an invalid element of damages under Casteel-, and, ultimately, denies the plaintiff her right, to submit material evidence going to proof of her claim that the defendant-physician breached the professional standard of care of a gynecological surgeon performing her operation.. Because I believe the majority opinion lays the groundwork for dangerous judicial overreach in overturning properly decided cases, I must dissent. ■
The Parties’ Arguments
Appellee Lauren Williams sued appellants Jim P. Benge, M.D., and Kelsey-Seybold Medical Group, PLLC, for medical malpractice, alleging breach of the standard of professional- care, of a physician performing an LAVH., Williams argued that Dr. Benge committed profes *714 sional negligence in performing her LAVH by turning over half the surgery to a resident physician, Dr. Giacobbe, who had never done an LAVH operation, greatly increasing the risk of the operation, without telling Williams that his co-surgeon was inexperienced and unqualified, with the foreseeable result that the resident pierced Williams’ bowel, causing severe life-long injuries.
During the trial, Dr. Benge’s counsel insisted that Williams was really arguing not only that Dr. Benge had breached the standard of care of a physician performing LAVH surgery — which she had pled — but also that he had breached a non-existent statutory duty of a physician to disclose that he was using an assistant — a liability theory Williams had not pled and with which she did not agree. Instead, Williams argued and produced evidence that Dr. Benge had used Dr. Giacobbe not as an assistant but as a co-surgeon, that he did not tell Williams he was using Dr. Giacobbe, and that his actions violated the professional standard of care. Thus, in my view, Williams created questions for the jury as to whether Dr. Benge used Dr. Giacobbe as an undisclosed and unqualified co-surgeon and whether, if he did, his use of Dr. Giacobbe as co-surgeon and his failure to disclose to Williams his intended use of an unqualified co-surgeon were acts of professional negligence.
Nevertheless, at the charge conference, Dr. Benge objected to the jury charge on the ground that the single broad-form jury question on professional negligence submitted to the jury allowed it to find liability based on breach of the statutory duty to disclose and obtain the patient’s informed consent and that “that theory was unsupported by the pleadings or the evidence.” The trial court overruled the objection. Dr. Benge also requested, in writing, an instruction to the jury that they were not to consider “what the defendant told, or did not tell, the plaintiff about the resident physician’s being involved with the surgery.” The court refused the instruction.
The case was submitted to the jury on a single broad-form negligence question of liability. The jury found that Dr. Benge was negligent and awarded Williams damages for mental pain and anguish, lost earning capacity, physical impairment, and medical expenses.
On appeal, Dr. Benge argues that the jury’s award of damages to Williams for his medical negligence was based, solely or primarily, on the invalid theory that he had a statutory duty to disclose the use of a resident assistant, which he did not have. And he argues that the trial court’s error in allowing the jury to consider evidence relating to this invalid theory of recovery as evidence of his medical negligence so contaminated the jury’s damage award that the case must be reversed and retried.
The majority accepts all of Dr. Benge’s arguments and reverses and remands the case. I do not accept them. I find them to be internally self-contradictory and also contradictory to the pleadings, the record, the charge, and the law. I do not agree with Dr. Benge that he has successfully injected an invalid theory of recovery into the case, preserved error as to its omission from the charge, succeeded in having the theory considered by the jury despite its omission from the charge, and is entitled to a new trial without the omitted theory— and without the evidence of malpractice it actually constitutes — because it was invalid and should not have been considered by the jury.
I find no error in the charge and ample evidence to support the jury’s verdict holding Dr. Benge liable to Williams for malpractice and awarding her damages for his breach of the duty of care of an ordinarily prudent physician performing an LAVH *715 operation. I agree with the majority that Williams’ expert, Dr. Patsner, was eminently qualified to testify and that the trial court did not err in admitting his testimony on the standard of care of a physician performing a hysterectomy. Therefore, I would affirm the judgment of the trial court.
Background

A. The Trial

• This is a case in which a patient, Williams, went to the hospital because of painful menstrual problems to have an elective LAVH performed by a surgeon she trusted and had used before, .Dr. Benge, and left the operating table with severe, lifelong- medical injuries. Dr. Benge’s own expert testified that he had “not personally” ever seen a patient have an outcome as bad as Williams’ from an LAVH. Williams’ expert, Dr. Patsner, testified, “She is actually the worst outcome I’ve ever seen after this operation in 30 years of taking care of patients with this, short of — short of dying.”
The undisputed evidence shows that Dr. Benge allowed a resident physician, Dr. Giacobbe, to perform all of the surgery on the left side of Williams’ body, even though he knew that she had never performed surgery of this type before. Both Dr. Benge and Dr. Giacobbe testified that Dr. Giacobbe performed 40% of the surgery, but the medical form signed by Dr. Gia-cobbe after the procedure stated that she was the “surgeon,” which meant that she performed 50% or more. There was conflicting evidence as to whether Dr. Benge told Williams that he would be using a medical resident to “assist” him — a disclosure Dr. Benge and Dr. Giacobbe testified they made and Williams denies they made. However, the evidence is undisputed that Dr. Benge did not tell Williams that he would be turning over all the surgery on one side of Williams’ body to Dr. Giacobbe. Rather, Dr. Giacobbe testified that Dr. Benge did not even tell her what part of the surgery she would be performing until after the surgery began. And the. evidence is undisputed that neither Dr. Benge nor Dr. Giacobbe told Williams that this would be Dr. Giacobbe’s first LAVH procedure. The operation left Williams with a life-threatening perforated bowel on the left side of her body — the side on which Dr. Giacobbe had performed the operation.
Immediately following the LAVH, Williams developed severe pain, abdominal tenderness, nausea, and a fever due to a perforated bowel. Dr. Benge checked her the next day, but failed to diagnose the perforated bowel. ■ Instead, he went home sick and turned over Williams’ care to Dr. Carmen Thornton.' Three days after the surgery, Dr. Thornton ordered a consultation with a gastroenterologist. The gastroenterologist performed emergency exploratory surgery that same night and determined that Williams had an undiagnosed bowel perforation that was allowing feces from her intestines to leak into her abdomen. A colostomy was required and performed. Williams developed sepsis, underwent a tracheotomy, and was placed in a medically induced coma. She suffered months of rehabilitation, including having to learn to breathe, walk, and talk again.
Williams was left with her vagina, bladder, and rectum fused together, and they had to be separated when doctors attempted to reverse the colostomy. However, the colostomy could not be reversed because there was not enough of Williams’ rectum and intestines left to stretch for the repair., Multiple surgeries followed, but the colostomy remained permanent, requiring the use of a colostomy bag. Williams is unable to have normal sexual relations, and she has ongoing depression, *716 anxiety, and post-traumatic stress' disorder, as well as physical symptoms.
Dr. Zepeda, Dr. Benge’s own medical liability expert, agreed that all of Williams’ injuries were a direct result óf the LAVH performed by Dr. Benge. Dr. Patsner, Williams’ expert, likewise testified that all of Williams’ surgeries and complications were a result of the LAVH.
' There was conflicting evidénce at trial from which the jury could have concluded either that Williams’ bowel perforation was caused by an electrical arc from a medical instrument, a Bovie, used during, the LAVH, as Dr. Benge theorized, or from a slit in Williams’ bowel on the side on which the resident, Dr. Giacobbe, performed the operation, as Williams’ expert testified. Either way, both Dr. Benge and his expert, Dr. Zepeda, agreed that Dr. Benge was responsible for any acts of negligence committed by Dr. Giacobbe. Dr. Zepeda agreed “absolutely” with the proposition that doctors are always responsible for the acts of the residents they supervise.
With respect to Dr. Benge’s failure to disclose to Williams that he intended to use Dr. Giacobbe as a co-surgeon, the record reflects the following exchange between Dr. Benge’s counsel and Williams’s expert, Dr. Patsner:
Q: Well, let’s talk a little bit about some of the claims we’ve made in this case.... Would you say that [Dr. Benge] violated the standard of care if he did not explain that the ' third-year resident — doing this, her first-time procedure — was going to ' be performing a part of the surgery?
A: Well, yes. There’s a — I mean, there’s a difference between being just an assistant and being a co-surgeon.
[[Image here]]
So in1 this particular instance there were two surgeons.
[[Image here]]
The — the standard of care is to get permission from the patient for everybody who’s going to be operating on them. You can’t have ghost surgeons.
Q: Period? End of story?
A: Period.

B. The Jury Charge

At the charge conference, Dr. Benge objected to submission of Williams’ case to the jury on a single broad-form negligence question as to liability, objecting to “Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or- the evidence.” The trial court overruled the objection.
Dr. Benge did not seek a legal ruling on his argument that his alleged failure to disclose his intended use of either “an assistant” or an unqualified co-surgeon constituted an invalid separate and independent theory of liability for Williams’ injuries that should be separately submitted to the jury as the proximate cause of some or all of her damages.
Dr. Benge did request, in writing, an instruction to the jury that “in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.” He did not state any reason for requesting this instruction, and the trial court refused it.
The case was presented to the jury on a single-broad form negligence question as to liability: “Did the negligence, if any, of any of those named below proximately cause Lauren Williams’ injuries in question?” Those named were Dr. Benge, Dr. Thornton, and Williams.' An instruction defined negligence with respect to the physicians as “failure to use ordinary care that *717 is, failing to do that which-an obstetrician/gynecologist of ordinary prudence would have done under the same or similar circumstances or doing that which an ob-stetrieian/gynecologist of ordinary prudence would not have done under the same or similar circumstances.” ■ ■
The jury found that Dr. Benge was negligent and' that Dr. Thornton and Williams were not. It awarded Williams $240,000 in damages for past and future pain and mental anguish; $302,609 for past and future lost earning- capacity, zero damages for disfigurement, $20,000 for past and future-physical impairment, and $1,332,960.14 for past and future medical expenses. It was not asked to find, and did not find, any separate damages for breach of a duty to disclose.
Analysis
Dr. Benge argues and the majority concludes that (1) Dr. Benge preserved his complaint by his objection to broad-form submission of Williams’ negligence claim on the ground that the question “allows the jury to base it's finding on a violation of informed consent and ,.. that theory is not supported by the pleadings or the evidence”; (2) as a matter of law, a physician has no duty to disclose to a patient that he intends to turn over laparoscopic-assisted surgery on half of a patient’s body to a co-surgeon who has never performed the operation; (3) the failure to make such a disclosure is a separate theory of liability that cannot, as á matter of law, constitute an act of professional negligence; (4) it was harmful error for the trial court to refuse to include this separate theory of liability in the charge and, likewise, to refuse to' include an instruction to the jury to disregard all evidence relating' to the theory of failure to disclose; (5) under the Texas Supreme Court’s ruling in Felton, a physician has no statutory duty to disclose the intended use of an unqualified co-surgeon to perform half of a patient’s laparo-scopic-assisted surgery, so that this unpled theory of liability is invalid; (6) the trial court erred in failing to submit this unpled and invalid theory of liability to the jury as a separate question while allowing it to consider evidence of the physician’s usé of an unqualified and inexperienced resident as an undisclosed co-surgeon as professional negligence; ‘ and (7) this error caused the jüry to award damages based on the unsubmitted, unpled, "and invalid theory of liability and was so harmful that (8) the appellate court is required by Cas-teel to reverse the judgment of the trial court and remand the case for retrial— without submission of the invalid, unpled, unsubmitted theory, and without evidence relating to it. Í disagree with each of these arguments and conclusions and believe that they are contrary to established legal authority.

A. Preservation of Error

Dr. Benge made the following objection to the jury charge: “Question No. 1, negligence, because the broad-form submission allows the jury to base its finding on a violation of informed consent and that that theory is not supported by the pleadings or the evidence.!* I would hold that this objection did riot preserve Dr. Benge’s complaint!
Texas Rule, of Ciyil Procedure 274, governing preservation of alleged error in the jury .charge, requires that an objecting party “must point out distinctly the objectionable matter and the grounds of the objection,” stating, that “[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.” Tex.R. Civ. P. 274. Likewise, Texas Rule of Appellate Procedure 33.1 requires a complaining party '(1). to make a timely objection to the trial court that “state[s] the grounds for the ruling that the complaining party *718 [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context” and (2) to obtain a ruling on his objection. See Tex. R.App. P. 33.1(a); State Dep’t of Highways & Pub, Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.1992). Under the preservation rules as articulated by the Texas Supreme Court, “A timely objection, plainly informing the court that a specific element ... should not be included in a broad-form question because there is no evidence to support its submission, ... preserves the error for appellate review.” Thota v. Young, 366 S.W.3d 678, 691 (Tex.2012) (emphasis in original) (quoting Harris Cnty. v. Smith, 96 S.W.3d 230, 236 (Tex.2002)).
Here, Dr. Benge did just the opposite of what the preservation rules require. .His sole argument regarding his objection to the charge was that the jury might have considered his “violation of informed consent” as an element of malpractice, implying that it was not an element of maiprac-tice, and not proof of malpractice, but a separate theory of liability. He then asked that the jury.be instructed to disregard all evidence of anything he had said to Williams about Dr. Giacobbe’s qualifications. He did not object that the, broad-form negligence question on which the case was submitted to the jury contained a specific element as to which there was no evidence. He objected that the single broad-form liability question on negligence permitted the jury to consider evidence in the record of what he argued was an un-pled theory of breach of the duty to disclose that was “not supported by the pleadings or the evidence.” At the same time, he, inconsistently, requested an- instruction that the jury could not consider the evidence of “what [Dr. Benge] told, or did not tell, [Williams] about the resident physician being involved with the surgery” that was present in the record. An objection to a broad-form question that it includes a theory as to which there is evidence a party does not want the jury to consider does not preserve error. See Thota, 366 S.W.3d at 691. Moreover, Dr. Benge did not satisfy Rule 274, requiring that an objecting party “must point out distinctly the objectionable matter and the grounds of the objection.” See Tex.R. Civ. P. 274; Thota, 366 S.W.3d at 690-91. I would hold that.the objection Dr. Benge made to the charge was insufficient to preserve his complaint on this point because it contradicted Rule 274 and Thota.
I would also hold that Dr. Benge’s objection was insufficient to preserve error because the link between the objection and the argument on appeal that the charge violated Casteel was not specifically stated and because the objection and argument on appeal are inconsistent both with each other and with Casteel. Casteel holds that the trial court’s submission of the case to the jury on a single broad-form negligence question is harmful error requiring reversal when it permits the jury to find damages on an invalid theory that was pled along with a valid one. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 387-88 (Tex.2000); see also Payne, 838 S.W.2d at 241 (stating that test for determining preservation of error in charge is “whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling”). Dr. Benge argues, and the majority agrees, that the theory he claimed Williams had not pled was not supported by the professional negligence pleadings or the evidence. I do not see how this objection can satisfy Rule 33.1’s and Payne’s requirement that an objection “state[ ] the grounds for the ruling that the complaining party [seeks] from the trial court with sufficient specificity to make the trial court aware of the complaint.” Tex. R.App. P. 33.1(a)(1)(A); Payne, 838 S.W.2d at 241.
*719 But even if I could agree that Dr. Benge preserved his complaint, I could not agree, that the trial court erred or that the objection on which this appeal is based is valid.

B. Charge Error

Texas Rule of Civil Procedure 277 mandates broad-form submission “whenever feasible.” Tex.R. Civ. P. 277; see also Tex. Dep’t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (interpreting “whenever feasible” as mandating broad-form submission “in any or every instance in which it is capable of being accomplished”); Comm. on Pattern Jury Charges, State Bar of Tex., Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts PJC 4.1 cmt. (2012). Rule 278 provides that the trial court must “submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the icrritten pleadings and the evidence.” Tex.R. Crv. P. 278 (emphasis added); Smith, 96 S.W.3d at 236 (“Whether a granulated or broad-form charge is submitted, the trial court’s duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence”).
Except in certain “special proceedings in which the pleadings are specially defined by statutes or procedural rules, a party shall not be entitled to any submission of any question raised only by a general denial and not raised by affirmative written pleading by that party.” Tex.R. Crv. P. 278 (emphasis added). And failure to submit a question, definition, or instruction “shall not be deemed a ground for reversal of the judgment unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment.” Id. “Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.” Tex.R. Civ. P. 279. Moreover, “if the trial court has ‘to resolve a legal issue before the jury could properly perform its fact-finding role[,] ... a party must lodge an objection in time for the trial court to make an appropriate ruling without having to order a new trial.’ ” Osterberg v. Peca, 12 S.W.3d 31, 65 (Tex.2000) (quoting Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 94 (Tex.1999) (per curiam)).
The trial court has considerable discretion in determining proper jury instructions. Thota, 366 S.W.3d at 687. “An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.” Id. (quoting Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 861, 855-56 (Tex.2009)). An appellate court does not reverse a judgment for charge error unless the error was harmful “because it ‘probably caused the rendition of an improper judgment’ or ‘probably prevented the petitioner from properly presenting the case to the appellate courts.’ ” Id. (quoting Tex.R.App. P. 44.1, 61.1).
In my view, every rule governing proper jury questions and instructions set out above would have been violated had the trial court submitted questions or instructions, at Dr. Benge’s request, based on the theory that Dr. Benge’s failure to disclose his intended use of an unqualified physician as a co-surgeon constituted a separate unpled and invalid cause of action of “failure to disclose” that did not constitute medical malpractice but as to which there was evidence and for which damages are separately recoverable so that it was required to be separately submitted to the jury. Thus, in my view, the majority opinion, which adopts each of these premises, erroneously construes the mandates of Rules of Civil Procedure 277, 278, and 279 and Rule of Appellate Procedure 44.1.
*720 Only one liability theory was pled by Williams: breach of the standard of care of an ordinarily prudent surgeon performing an LAVH operation. Neither party pled breach of a statutory or separate common law, duty to disclose. Rather, Williams alleged only that Dr. Benge violated the standard of care of an ordinarily prudent gynecological surgeon by failing to disclose that Dr. Giacobbe, for whom he had supervisory responsibility, would be performing half of Williams’ LAVH operation by herself and that she had never done such an operation before and then by using her to perform 50% of the surgery and negligently supervising her work so that she pierced Williams’ bowel, causing severe injuries. There was evidence from which the jury could have found all of these facts, and there was expert testimony that each of these acts was an act of malpractice.
The allegedly invalid theory of failure to disclose was not raised by the written pleadings, and Dr. Benge argued that it also was not raised by the evidence before arguing that it was raised by the evidence. Therefore, he cannot argue on appeal that the charge was improper under Rules 277 and 278. See Tex.R. Civ. P. 278 (requiring that trial court submit only questions and instructions “raised by the written pleadings and the evidence”). Dr. Benge did not ask the trial court to determine whether Williams had actually pled failure to disclose as a separate cause of action or to rule that the issue had been tried by consent, as required by Osterberg. See 12 S.W.3d at 55 (requiring that party lodge objection in time for. trial court to make appropriate ruling if required “to resolve a legal issue before the jury could properly perform its fact-finding role”). He made no proper request for an instruction going to whether Williams was entitled to recover damages on the independent theory of recovery for failure to disclose that he now asserts 'on appeal, nor did he submit such an instruction in substantially correct form, as required by Rule 278. See Tex.R. Civ. P. 278. Thus, he waived the complaints of jury charge error upon which he relies on appeal.: See Tex.R. Civ. P. 279 (“Upon appeal all independent grounds of recovery or- of defense not conclusively established under the evidence and no element of which is submitted or requested are waived.”).
There is absolutely nothing to show error in the charge in this case. Rather, review of the pleadings, the record, the evidence, and the rules of procedure confirms that submission of this case to the jury on a broad form negligence question was not only within the trial court’s discretion but the only proper form for submission. See Tex.R. Crv. P. 277 (requiring that “the court shall, whenever feasible, submit .the cause upon broad-form questions”); E.B., 802 S.W.2d at 649 (interpreting “whenever feasible” as mandating broad-form submission “in any or every instance in which it is capable of being accomplished”); Tex. Pattern Jury Charges: General Negligence & Intentional Personal Torts PJC 4.1 cmt.
The majority, however, concludes that Dr. Benge not only preserved error but showed reversible error in the jury charge. I turn, therefore, to the merits of Dr. Benge’s argument on appeal that Williams’ case included an invalid theory of liability that should have been submitted to the jury separately from her malpractice claim.
C. Felton and Breach of the Duty to Disclose
The majority characterizes the evidence relating to Dr. Benge’s failure to disclose that he was using-áh unqualified and inexperienced co-surgeon not- as part of the evidence showing his breaches of the duty of care of a surgeon but as evidence that Williams’ pleadings included as an invalid theory of liability separate from medical *721 negligence. In my view, this re-characterization of the theory of liability''pled by Williams and tried to the jury has no valid basis either in Williams’ pleadings or in the law. Yet the majority’s holding depends entirely upon this re-characterization of the case at Dr. Benge’s invitation and its interpretation of the law governing the physician’s duty to disclose the use of an assistant. ■
As the majority states, the common law — the law that encompasses medical negligence — requires that a reasonable health care provider must disclose “the risks that would influence ' a reasonable patient in deciding whether to undergo treatment.” Op. at 708 (quoting Felton v. Lovett, 388 S.W.3d 656, 661 (Tex.2012)). The common law risks that must be disclosed under Felton are those “inherent” in treatment, i.e., risks “that ‘exist[ ] iñ and [are] inseparable from the procedure itself.’ ” Felton, 388 S.W.3d at 661. '“Inherent risks of treatment are those which are directly related to the treatment and occur without negligence.” Id. at 662.
Felton distinguished the common law duties of physicians from the statutory duty to disclose set out in Civil Practice and Remedies Code section 74.106, even as the court recognized that, “probably in all cases, the common-law and statutory duties are congruent.” Id. at 661. “Malpractice, for example,” the court pointed out, “is an extraneous risk, one that inheres in the practice of health care, not in the care itself,” and thus is itself not an inherent risk of surgery that must be disclosed. Id.. at 662 (emphasis in original).
Williams, however, made no claim that Dr. Benge failed to comply with the disclosure statute, Civil Practice and Remedies Code section 74.101. And her claim was not that Dr. Benge was liable to her for her injuries because he failed to disclose the use of a resident as an assistant.
Williams claimed that Dr. Benge did not use the standard of care of an ordinarily prudent gynecological surgeon in performing her LAVH; and she included, among Dr. Benge’s acts of malpractice as a supervising surgeon responsible for the work of Dr. Giacobbe, his failure to disclose a risk inherent in in “the care itself,” namely, the greatly increased risk that an inexperienced, unqualified surgeon performing la-páróscopic-assisted vaginal surgery for the first time, by herself, with only the instructions and example of her co-surgeon on the other side of the patient’s body as guidance, will make a mistake that a qualified surgeon who had performed an LAVH in the past would not make, causing harm to the patient. This is exactly the type1 of risk that rhust be disclosed under Felton. See id. at 661 (requiring that “a reasonable health care provider must disclose the risks that would influence ■ a reasonable patient in deciding whether to undergo treatment”). The law does not permit physicians to use patients as guinea pigs without their consent; And doing so is exactly the'type of act that is probative of breach of the professional standard of care.
Here, Williams paid for Dr. Benge’s mistakes with her health and almost with her life. She did so not because Dr. Benge failed to disclose that he would be using an assistant but because, as Williams’ gynecological surgeon, he had a duty to perform the surgery at a professional level And the evidence — including expert testimony of the standard of care of á gynecological surgeon performing an LAVH procedure — shows that he used an unqualified physician to perform ’half the surgery; that he failed to disclose either to Williams or to his- co-surgeon the extent of the surgery he expected his co-surgeon tó perform; that if was risky to turn over half of this sophisticated surgery to someone who had never done this type of surgery; that *722 both his use of the physician he was supervising in this way and his failure to disclose his use of an unqualified co-surgeon to perform half of Williams’ s.urgery were breaches of his professional standard of care; that the unqualified physician he was supervising perforated Williams’ bowel; and that Williams almost died and suffered life-long injuries from this wound. A jury’s consideration of evidence of duty, breach, causation, and injury in determining a physician’s liability for breach of the standard of professional care and damages for a professional negligence claim is not consideration of commingled valid and invalid theories of liability.
Dr. Giacobbe testified that Dr. Benge did not disclose even to her the extent of the surgery she would be performing. The. evidence is undisputed that he did not disclose this- fact to Williams. Nor did Dr. Benge disclose that Dr. Giacobbe had never performed an LAVH. And Dr. Zepeda, Dr. Benge’s own medical liability expert, agreed that “[ajbsolutely,” doctors are always responsible for the acts of the residents they supervise, as did Williams’ expert, Dr. Patsner. This is all critical evidence of breach of Dr. Benge’s duties as a surgeon, and it is evidence that Dr. Benge wanted withheld from the jury in this malpractice case. To my mind, the jury was clearly entitled to consider this evidence, along with all the other evidence of Dr. Benge’s breaches of the standard of professional care of an ordinarily prudent gynecological physician performing an LAVH, in making its decision whether Dr. Benge was medically negligent and thereby foreseeably caused Williams’ injuries.
The majority does not point to .any evidence, in the record to rebut Dr. Patsner’s expert testimony that the standard of care of a physician performing a hysterectomy includes a duty “to get permission from the patient for everybody who’s going to be operating on them” or to rebut Dr. Patsner’s, Dr. Zepeda’s, and Dr. Benge’s testimony that Dr. Benge was responsible for any acts, of negligence committed by Dr. Giacobbe, whom- he was supervising and to whom he turned over half of Williams’ surgery.
Instead, the majority assumes, contrary to the testimony and the pleadings, that there is no difference between “being just an assistant and being a co-surgeon”; that Dr. Giacobbe was only an assistant (which was a question for the jury); that there is no duty to disclose the intended use of an unqualified co-surgeon under the section of the MLA that deals with the risks of surgery; that this failure to disclose the risks of using an unqualified co-surgeon is not below the standard of care of a gynecological surgeon (despite expert testimony to the contrary); that, therefore, Dr. Benge could not have been committing malpractice when he handed over half the surgery to an unqualified co-surgeon and failed to disclose to Williams how he intended to perform the operation; that the claim that Dr. Benge violated the duty to disclose was, instead of evidence, a disguised separate and invalid theory of liability; that it was harmful error for the trial court to refuse to submit this unpled theory of liability to the jury separately from Williams’ negligence theory; that it was also harmful error for the trial court to refuse to instruct the jury not to consider any evidence of what Dr. Benge told Williams about Dr. Giacobbe; and, because this invalid theory was not separately submitted and the evidence of failure to disclose was before the jury, that the jury probably found damages — or most or all of the damages — it attributed to Dr. Benge’s malpractice only on the unpled and invalid theory of recovery for a violation of the MLA’s disclosure requirement. All of these assumptions flow from the majority’s initial mischaracterization of Dr. Benge’s failure to disclose Dr. Giaeobbe’s lack of *723 qualification as a separate theory of liability from malpractice, rather than as one of a number acts from which the jury could have reasonably concluded that Dr. Benge breached the standard of professional care of a gynecological surgeon performing an LAVH, and from its conclusion that Dr. Benge preserved genuine errors in the charge.
Notably, although the majority’s holding depends on its conclusions that it is not a breach of the professional standard of care for a surgeon to fail to disclose that an unqualified and inexperienced co-surgeon will be performing half of an operation and that this act is not a breach of any other duty, the majority does not make an argument from authority for these conclusions other than its construction of Felton, the argument that no other court has recognized the duty the majority introduces into the case and finds invalid, and an argument by analogy to medical battery. See Op. at 706-10.
I cannot agree with the majority that this case shows any error in the charge. This conclusion becomes even more compelling when the majority’s holding that the trial court’s jury charge error was so harmful that the judgment must be reversed and the case remanded for retrial under Casteel is considered.
D. Casteel and the Commingling of Valid and Invalid Theories of Liability
When a charge issue is properly preserved and contested on appeal,, the appellate court reviews the basis of the complaint and reverses only if- the alleged charge error was harmful. Tex.R.App. P. 44.1(a) (stating standard for reversible error); Thota, 366 S.W.3d at 691.
In Casteel, the supreme court found harmful error because the single broad-form question submitted to the jury for violation of Insurance Code article 21.21 included not only the plaintiff’s claims of liability for violations of the DTPA incorporated into the Insurance Code, for which he had standing, but also the plaintiffs claims for DTPA violations for which he did not have standing because he was not a consumer within the definition contained in the DTPA. See 22 S.W.3d at 386-87. Under Casteel, “when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is.'required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory.” Id, at 388; see also Tex.R.App. P. 44.1(a) (providing, “No judgment may be reversed on appeal ... unless the court of appeals concludes that the error complained of ... probably prevented the appellant from properly presenting the case to the court of appeals”).
In Harris County v. Smith, the supreme court extended the Casteel holding to broad-form liability questions that' commingle damage elements when an element is unsupported by legally sufficient evidence. 96 S.W.3d at 234. Under Casteel and Smith, the appellate courts “presume that the error was harmful and reversible and a new trial required when [they] cannot determine whether the jury based its verdict solely on the improperly submitted invalid theory or damage element.” Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 756 (Tex.2006) (emphasis added).
Casteel and Smith both require that a plaintiff have actually pled an invalid theory of recovery and have then sought damages from the jury under a single broad-form liability question that permitted the recovery of damages on the invalid theory as well as on a valid theory. Here, the contention that the broad-form negligence question on liability submitted to the jury permitted the jury to award damages on an invalid theory of breach of a non-existent unpled and unsubmitted duty to dis *724 close is entirely a defensive argument raised by Dr. Benge. What Williams asked the jury to find was whether Dr. Benge’s act of using an undisclosed, unqualified co-surgeon to perform half of her LAVH surgery, among other acts, breached the standard of care of a gynecological surgeon and proximately caused her injuries. And' she ■ rested her case on her ability to prove that Dr. Benge’s acts breached the standard of care of a gynecological surgeon performing an LAVH, causing her injuries and justifying the damages awarded her.
Nevertheless, Dr. Benge argues, and the majority concludes, that the single broad-form liability question on negligence submitted to the jury improperly sought damages on the unpled invalid theory Dr. Benge proposes. And Dr. Benge argues, and the .majority concludes, that the un-pled and unsubmitted invalid theory formed the primary or even “the sole basis of the jury’s finding” that Dr. Benge committed malpractice, entitling Williams to damages. And Dr. Benge argues, and the majority concludes, that this separate, un-pled, invalid cause of action on which the trial court submitted no question and no instruction to the jury so infected the damages award that the judgment must be reversed and the case tried again without it.
In my. view, even .assuming that Dr. Benge preserved a claim of error in the submission of the charge, what the majority views as an infectious u'npíed and un-submitted — but considered — theory of liability is only evidence from which the jury could reasonably have concluded that Dr. Giacobbe did act as a co-surgeon; that she was not qualified; that her mistake caused Williams’ injuries; and that 'Dr. Benge’s performance as the sole disclosed surgeon and as Dr. Giacobbe’s supervising physician fell below the standard of care of a surgeon performing an LAVH because he knew of Dr. Giacobbe’s lack of experience, used her as a co-surgeon anyway, failed to adequately instruct and supervise her, and failed to disclose either to Williams or to Dr. Giacobbe herself how he intended to use Dr. Giacobbe in performing the operation. I believe this evidence was properly submitted to the jury and is both legally and factually sufficient to support the jury’s finding that Dr. Benge breached the standard of care of a reasonably prudent physician performing an LAVH, entitling Williams to damages for her injuries caused by the breach.
Conclusion
The majority separates the failure to disclose the use of an unqualified, resident as a co-surgeon from the professional duties of a supervising surgeon, declares it not to be an element of professional negligence, despite unrebutted expert testimony .to the contrary, and requires that failure to disclose be pled separately as a statutory violation with its own damages. Thus, in my view, it dramatically broadens the scope of Felton. Likewise, it dramatically broadens the concept of reversibility on Casteel grounds by concluding that it was harmful error for the trial court not to submit this unpled and invalid theory of liability to the jury, improperly allowing the jury to award damages to Williams based, in- part, on unrebutted expert testimony that Dr. Benge breached the professional standard of care of a gynecological surgeon performing an LAVH by, among other acts, failing to disclose his intention to use an unqualified co-surgeon to perform half of the surgery by herself. And it draws both of these conclusions despite Dr. Benge’s failure to comply with any of the rules that would permit this Court to find that he preserved the charge error of which he complains on appeal.
*725 The foreseeable result of the majority’s ■holding is that its opinion mil cause future litigants to attempt to do the same thing Dr. Benge has successfully done here: to re-charaeterize a properly pled, tried, and decided negligence case submitted to the jury on a broad-form liability question as one in which the pleadings did not mean what they said; one in which, as a matter of law, it is not an act of malpractice for a surgeon to fail to disclose that he is using a co-surgeon for an LAVH who has never performed the operation, has no qualifications to perform it, and nevertheless will be performing the entire operation on one-half of the patient’s body; one in which evidence that a supervising physician failed to disclose his intended use of an unqualified and inexperienced co-surgeon may not even be submitted to the jury and is harmful error unless excluded; one in which a jury may be presumed to have awarded damages on a theory of recovery that is invalid, that was not pled, and that was not submitted to it in the charge either by questions or by instructions; one in which a carefully articulated damages question listing only elements of damages validly recoverable for medical negligence nevertheless conceals a finding of damages on an unpled and unsubmitted theory of breach of the statutory duty to disclose; and one in which the failure to separate out this unpled and unsubmitted theory of liability and exclude it from consideration is deemed to be harmful error by the trial court that requires reversal of the trial court’s judgment by the appellate court and retrial without the same unsubmitted theory of recovery and also without material evidence of professional negligence related to duty, breach, and causation of the plaintiffs injuries.
The result of the majority’s analysis is that this case is remanded to be retried on the same theory and same facts on which it was tried the first time, and to seek the same elements of damáges under the same charge — but with an instruction that evidence that Dr. Benge used an unqualified and inexperienced resident physician he was supervising' as an undisclosed co-surgeon is not evidence of breach of the standard of professional care and must not be considered. Indeed, the majority effectively declares such evidence inadmissible.
For the foregoing reasons, I cannot join the majority opinion. I therefore respectfully dissent. Finding no error, I would affirm the judgment of the trial court.
SUPPLEMENTAL OPINION ON MOTION FOR EN BANC RECONSIDERATION
The en banc court consists of Chief Justice RADACK and Justices JENNINGS, KEYES, HIGLEY, BLAND, MASSENGALE, BROWN, HUDDLE, and LLOYD.
HARVEY BROWN, Justice.
We limit our discussion to two issues raised in the opinions dissenting from the denial of en banc - reconsideration: (1) whether Williams offered evidence on the lack of disclosure only to challenge Dr. Benge’s credibility and (2) the nature of the jury-charge error for which we found presumed harm.
-I.
The dissent accepts Williams’s contention-that she raised the issue of lack of disclosure not for an invalid purpose (to obtain a finding that Dr. Benge violated the standard of care by failing to disclose) but for a valid one (to explain to the jury that it could, based on Dr. Benge’s “deceit” of not telling Williams about Dr. Gia-cobbe’s inexperience, draw a conclusion that Dr. Benge was untruthful when he testified at trial that the injury was caused by an electrical arc instead of medical negligence). This explanation is belied by the evidence and the closing arguments.
*726 For example, in final argument, Williams did not argue that Dr. Benge’s alleged deceit was relevant either to his credibility or to whether some other action he took or failed to take during or after the surgery violated the standard of care. Instead, the jury was told that the “deceit” itself violated the standard of care. Similarly, Williams’s medical expert testified that Dr. Benge violated the standard of care by not telling Williams that Dr. Gia-cobbe would participate in the surgery.
After criticizing defense expert Dr. Toy’s testimony that a physician does not have to “inform the patient [that] the resident will be performing the surgery,” Williams told the jury, “[I]f that’s what you want the standard to be, ... [g]o back and find for them.” After talking further about the lack of disclosure, Williams argued, “[I]f you approve that standard today, that will become the standard. You disprove the standard today, you send them a message, the standard changes.”
The last words to the jury asked it to establish a standard of care that requires surgeons to disclose resident participation:
You know, we’re trying to get you to enforce the safety rules here.... If you don’t think they’re important, put zero.... Can you imagine what will happen, though, if you do? ... They’re going to go back [to] doing the same thing they’ve been doing: not telling people about who’s doing the operation.
That is not a credibility argument; it is an argument about negligence and, specifically, negligence due to lack of disclosure.
II.
The error in the jury charge was not simply the denial of Dr. Benge’s proposed instruction, which, if given, could have appropriately confined the jury to consideration of only valid legal theories. It was also the submission, over Dr. Benge’s objection, of a single broad-form jury question that mixed a valid and invalid theory, without any attempt to segregate them.
In Casteel and Hawley, charge error prevented the Court from determining whether the jury found liability on an invalid theory or basis. First, in Casteel, a single broad-form liability question mixed valid and invalid theories, and harm was presumed. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 389-90 (Tex.2000); Romero v. KPH Consol., Inc., 166 S.W.3d 212, 227 (Tex.2005). Then, in Hawley, the trial court improperly denied a requested instruction. Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 863-64 (Tex.2009). The Court noted that this was a different type of error and that, historically, jury-instruction error would not result in a court applying a presumed-harm analysis. Id. at 864. But the Court concluded that the presumed-harm test of Rule 61.1(b) nevertheless applied because the error precluded the reviewing court “from determining whether the jury found liability on an invalid basis.” Id. at 865. The presumed-harm rule applied because the error “prevented] proper presentation of the case on appeal.” Id.; see Tbx,R.App. P. 44.1(a)(2).
That same result has occurred here. Williams signed a patient-disclosure document authorizing her surgeon to be assisted in the surgery. Texas law does not recognize a duty on a supervising doctor to disclose a resident’s participation beyond that disclosure. But Williams’s expert testified that Dr. Benge violated the standard of care by failing to disclose that the resident would participate in the surgery. The jury was then asked, generally, whether Dr. Benge did what an ordinarily prudent surgeon would have done. In this framework, it is impossible to determine whether the act or omission that the jury found to have fallen below the standard of care was a permissible one, like surgical error or supervisory neglect, or an imper *727 missible one, the much-discussed failure to disclose resident participation. Accordingly, harm is presumed.[1] See Hawley, 284 S.W.3d at 865; Tex.R.Ap p. P. 44.1(a)(2).
There were easy solutions to this error, including - narrowing the question to inquire about negligence during or after the surgery or. instructing that a failure-to disclose could not form the basis for a finding of negligence.[2] Either would have prevented the error.
[[Image here]]
Juries are given the important task of absorbing and sifting through the evidence, weighing the credibility of witnesses, and applying the law as instructed to them to answer jury questions. We should trust them to perform this task by submitting proper jury questions and instructions. Nudging them with a jury question that mixes an invalid legal theory with a valid one demonstrates a distrust of their ability to correctly assess liability on the valid theory. Because the jury was given a jury question that failed to comply with the law, over Dr. Benge’s objection, this case must be returned to the trial court.
Justice BROWN, writing a supplemental opinion on motion for en banc reconsideration, joined by Justice BLAND.
Justice JENNINGS, dissenting to the denial of en banc reconsideration with a separate opinion, joined by Justices KEYES and HIGLEY.
Justice KEYES, dissenting to the denial of en banc reconsideration with a separate opinion.
Justice LLOYD, dissenting to the denial of en banc reconsideration with a separate opinion, joined by Justices KEYES and HIGLEY.
TERRY JENNINGS, Justice, dissenting from denial of en banc reconsideration.
I respectfully dissent from the Court’s order denying en banc reconsideration in this case.
For many years now, the civil bench and bar in Texas have been lamenting the “vanishing jury trial.” In a recent Texas Bar Journal dedicated to addressing this grave concern, Texas State Bar President Trey Apffel explains that “lawyers should be committed to promoting and protecting the rule of law, standing firm for- equal access to justice for all people, and educating the public that the right to a trial by jury is the very foundation of our liberties and freedoms.”[1] This call to action is very appropriate, especially for members of the judiciary, in the year 2015, as we celebrate the 800th anniversary of Magna Carta, which first provided for public justice in a “certain place,”[2] trial by jury based on the evidence of “credible witnesses to the truth,”[3] equal protection of the law,[4] justices who “know the law of the *728 land and will keep it well,”[5] and the rule of law according to “the lawful judgment of [one’s] peers and by the law of the land.”[6]
However, in the very, same Texas Bar Journal, the authors of another article boldly proclaim that the “days of the trial lawyer are essentially gone.”[7] In addressing the fact that civil lawsuit filings are down seventeen percent in Texas in the last ten years, Texas Supreme Court Chief Justice Nathan Hecht notes, “Anytime there’s that kind of a shift, then you’ve got' to wonder what is happening. But I think right now, I’m not sure what the answer is.”[8]
This case provides some illumination.
Background
Although..this Court has long struggled with the .correct disposition of this appeal, the issues in this simple medical-negligence case are not hard. Seven years ago, in August 2008, appellee, Lauren Williams, who was thirty-mine, years old, was admitted to.. Methodist Willowbrook Hospital (“Methodist”) to undergo a laparoscopic assisted vaginal hysterectomy (“LAVH”) by the surgeon with whom she contracted, appellant, ■ Jim P. Benge, M.D. Benge worked for appellant, Kelsey-Seybold Medical Group, PLLC (“Kelsey-Seybold”).
Something went terribly wrong during the surgery. After the LAVH, Williams showed, signs .of a serious infection and internal bleeding for almost three days. A subsequent surgery revealed that during the LAVH; she had suffered a rectal perforation and urethral injury. After undergoing a colostomy and urethral repair, doctors admitted Williams- to the Intensive Care' Unit (“ICU”) ih septic shock. They placed her in a medically induced coma for three weeks, and she required a mechanical ventilator to breath. Doctors also had to perform a tracheotomy on Williams because of her compromised pulmonary system.- And she received antibiotic therapy and intravenous nutrition. In October 2008, Williams was released to a long-term acute care facility, where she spent a month recovering. She had to endure several subsequent surgeries, and she continues to suffer from the wounds inflicted upon her and complications resulting from her permanent colostomy.
What went-wrong during the LAVH?
At trial, Williams presented evidence that, unbeknownst to her, Dr. Benge had a Methodist resident, Dr. Lauren Giacobbe, perform forty to fifty percent of the surgery, even though Giacobbe had no previous experience performing the procedure. Williams also presented the shocking evidence that Benge did not tell her .prior to the LAVH that a resident would be performing forty to fifty percent of her surgery, and he did not tell Giacobbe prior to the LAVH that she would be performing any part of Williams’s surgery. This is especially surprising considering that Benge knew that Giacobbe had not previously'performed an LAVH. Williams’s evidence further reveals that during her long and painful recovery after the LAVH, Benge never informed her or her family of Giacobbe’s part in the surgery. Indeed, according to Williams, she did not learn of *729 Giacobbe’s role in the LAVH until after she had filed this lawsuit. ■
Thus, in addition to presenting evidence of Dr. Benge’s negligence, as a surgeon and supervisor of Dr. Giacobbe, Williams also presented compelling evidence that Benge did not properly prepare Giacobbe for her role during the LAVH and evidence calling into question Benge’s credibility — evidence which is completely at odds with Benge’s testimony that Williams “gave [him] consent to have Dr. Giacobbe participate in the surgery.”
And because evidence was introduced that Dr. Benge believed that the injuries inflicted upon Williams during the surgery were caused by “an electrical arc from [a] Bovie,” an electrical cauterizing instrument, and not his own negligence as a surgeon and supervisor, Benge’s credibility was an issue that was front and center throughout the trial. Flatly rejecting Benge’s testimony regarding causation, Dr. Bruce Patsner, Williams’s medical expert, testified that the perforation of Williams’s intestine was inflicted as the result of a surgical cut made during the vaginal portion of the procedure. Patsner opined that, based on reasonable medical probability, the perforation was caused by Dr. Giacobbe, who had no experience performing the procedure. Patsner further opined that Benge, while Williams suffered immediately after the LAVH, should have suspected a bowel injury and failed to timely and properly address Williams’s post-operative complications, resulting in a “septic shock catastrophe.”
In her 'Second Amended Petitión, Williams sued Dr. Benge and Kelsey-Sey-bold only for negligence. And the only theory of liability that -the trial court submitted to the jury was for negligence. In its charge, after supplying the jury with the standard definitions on “Ordinary Care,” “Negligence,” and “Proximate Cause,” the trial court asked:
Did the negligence, if any, of any of those named below proximately cause Lauren Williams’ injuries in question?
Answer “Yes” or “No” for each of the following:
Jim Benge, M.D_
Carmen Thorton, M.D. __
Lauren Williams_
The jury answered “Nó” as to Dr. Thorton and Williams and ‘Tes” ás to Benge.
Instruction Error and Harm
Let there be no mistake; Williams did not plead, present any' evidence, or ask the jury to find that Dr. Benge was in any way negligent in failing to inform her of “the risks and hazards involved” in the LAVH. See Tex. Civ. Peac. & Rem.Code Ann. § 74.101 (Vernon 2011). And the trial court did not submit any such issue to the jury to co-mingle with Williams’s simple medical-negligence claim.
• In a suit against a physician involving a health care liability claim that is “based on the failure of the physician .... to disclose or adequately disclose the risks and hazards involved in [a] ... surgical procedure rendered by the physician,” “the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.” Id. (emphasis added). Thus, in regard to section 74.101, Dr. Benge only had a duty to inform Williams of “the risk and hazards involved” in the procedure as determined by the Texas Medical Disclosure Panel. Id. §§ 74.101-103 (Vernon 2011). Not only did Williams not allege or present any evidence that Benge had violated this duty, she also did not dispute his evidence that he in fact did inform her of “the risks and hazards involved” in the LAVH, as required by section 74.101.- Thus, section *730 74.101 simply does not apply in the instant case.[9]
Regardless, the panel majority concludes that the trial court’s “single question [to the jury] ... ‘effectively submitted’ two different negligence questions.” (Emphasis added.) In support of this conclusion, the panel majority creates a straw man, asserting:
Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision and he negligently failed to provide that information to Williams before the operation.[10]
(Emphasis added.) It further asserts that Williams’s evidence and what it characterizes as her “trial theme” “created the possibility of a liability finding based on either of the two negligence theories: negligence during and after the surgery and negligence before the surgery in failing to disclose Dr. Giacobbe’s participation or level of experience.” (Emphasis added.)
Again, let there be no mistake: Williams did not assert that Dr. Benge had “negligently failed” to inform her that Dr. Gia-cobbe “was going to perform a substantial portion of the surgery.” She expressly, and in no uncertain terms, stated that his testimony that she .had actually “g[iven him] consent to have Dr. Giacobbe participate in .the surgery” was false. If Williams’s presentation of the case had an underlying “theme,” it was that Benge, prior to the LAVH, intentionally deceived her into' believing that he would be her *731 surgeon, and, after the LAVH,. intentionally withheld information from her and.-her family regarding Giacobbe’s role in causing her injuries.
Although the parties and this Court have used the words “informed consent” and “disclosure” in a somewhat confusing manner, the record, when read in context, reveals that Williams’s use of these terms in the trial court directly related to Dr. Benge’s credibility, his breaking of his “bond” with her to perform the surgery himself, his lack of respect for her as a patient, and his complete lack of candor after the botched LAVH. For example, in her opening statement, Williams, without objection, asserted:
It is not Dr. Benge’s choice to treat this •patient as a human guinea pig. He doesn’t have that choice. It’s the patient’s choice.
He made the- choice for her, and he didn’t tell her that Resident Lauren Gia-cobbe was going to do the procedure. He didn’t tell her that the resident had never done the procedure before. To this day, he didn’t tell her that.
You see, after it was over, when the family was there at her bedside, he came and talked to them; he didn’t tell them the full story. He didn’t tell her, the family first, that a resident did a significant amount of this procedure. When she woke up, he didn’t tell'her that a resident did a significant amount of this procedure.
(Emphasis added.) In he? closing argument, Williams, again without objection, emphasized:
[W]ho did Lauren Williams hire -to be her surgeon? Kelsey-Seybold, Dr. Jim Benge. He — she hired his hands, his experience; but under • anesthesia, she got another set of hands working on her, some — a set of hands she did not know, who had never done the job before, had no experience. You can’t do this in our community. And we didn’t even find out about any of this until after this lawsuit was filed.
[[Image here]]
Doctors who don’t use ordinary care have to be held accountable, and they agree with that. As caretakers of our community, you also enforce the values that we have, and I believe in this city, in this state, your word is your bond. Dr. Benge’s word that he was going to perform the surgery is his bond. They may say “I want you to just look at the word ‘resident’ in that disclosure.” I do want you-to look at it,.not just the word “resident,” the whole sentence.
Was a resident necessary to do this procedure? No, because a nurse could’ve assisted in this procedure. Was the resident required? No, because Dr. Benge testified “I could do a hundred percent of this procedure.”
So read the words, all of the words, not just the pieces that they want you to look at.
A contract — she hired Dr. Benge to do the.surgery.- He agreed to do the surgery. He didn’t do all of the surgery. No matter how you parse it....
[[Image here]]
As caretaker of our community, hold them, to their word. Make them do what they promise to do from here on out. “If you promise to do the surgery and you’re in si, private hospital, do the surgery.” The fact that people at Ben Taub. get more information than you do 'should be appalling to each and every one of you. When your family members, when you,.your friends go into the hospital, you will now know “I need to ask some questions,”
(Emphasis added.)
Moreover, Williams, in her closing, again without objection, made specific reference *732 to the fact, which she established through her medical expert, that the American Medical Association (“AMA”) Code of Medical Ethics Opinion 8.16 states that “[a] surgeon who allows a substitute to operate on his or her patient without the patient’s knowledge and consent is deceitful.” [11] ■ Williams argued:
Then we talk about what the national standards are. I didn’t say he was deceitful. That’s what the AMÁ says. The AMA says a surgeon who allows a substitute to operate on his or her patient without the patient’s consent is deceitful.
That’s ' not me arguing. That’s the AMA. These people are members of the AMA That’s their guidelines. That’s what the AMA says.
(Emphasis added.) If the jury believed Williams’s evidence that Dr. Benge did not tell her about Dr. Giacobbe’s role in the LAVH, then it, considering the AMA’s Code of Medical Ethics, could have reasonably believed that, in his dealings -with Williams, he acted unethically and deceptively.[12]
*733 Just because Williams referred to the facts that she had a contract with Dr. Benge to perform the LAYH and he had broken his “bond” with her, does not mean that she was asking the jury to find him liable for breach of contract. Likewise, just because Williams referred to the facts that Benge did not tell her that he was going to have a resident perform forty to fifty percent of the surgery and, thus, acted “deceitfulfiyl” and unethically as per the AMA, does not mean that she was, as claimed by the panel majority, asking the jury, to find that “he negligently failed to provide that information to Williams before the operation.” (Emphasis added.) Simply put, the fact that Williams presented evidence and argued that Benge violated the standards of the AMA’s Code of Medical Ethics did not transform her medical-negligence case into an “informed-consent” case.
Nevertheless, the panel majority, based entirely upon its own characterization of Williams’s case, and not the case that she actually tried, proceeds to knock down its straw man, holding that the trial court’s “broad form negligence question effectively included an informed consent issue and therefore violated” Crown Life Insurance Co. v. Casteel, 22 S.W.3d 378 (Tex.2000). In support of this holding, the panel majority relies on Casteel, Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851 (Tex.2009), and Texas Commission on Human Rights v. Morrison, 381 S.W.3d 533 (Tex.2012). However, neither Casteel nor Hawley nor Morrison supports the panel majority’s holding.
In Casteel, the Texas Supreme Court held,
[W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory. See Tex.R.App. P. 61.1 (“No judgment may be reversed on appeal ... unless the Supreme Court concludes that the error complained of ... probably prevented the petitioner from properly presenting the case to the appellate' courts.”); see also Tex.R.App. P. 44.1(a)[13]
22 S.W.3d at 388 (emphasis added). In reaching its holding, the court noted that the trial court’s jury charge contained “a single broad-form liability question” containing instructions “on thirteen independent grounds for’ liability,” four of which were invalid because they “required ... consumer status,” which the plaintiff did not have. Id. at 387-88.
In Hawley, the supreme court, in an issue that it labeled as “Failure to Give the Instruction,” held that the trial court erred in not instructing the jury, as requested by the defendant-hospital, that it could not consider the acts or omissions of a defendant-doctor, who was not an agent of the hospital, when determining the hospital’s negligence. 284 S.W.3d at 862-65. The trial cqurt’s liability question asked, ‘Was the'négligence, if any, of [the defendant-hospital], a proximate cause of injuries to [the plaintiff]?” Id. at 863. The court *734 noted that the trial court had instructed the jury that the defendant-hospital “acts or fails to act only through its employees, agents, nurses, and servants” and certain evidence showed that the defendant-doctor worked in an office in the hospital and had “input” in the hospital’s policy that its pathologists were to verbally notify doctors when a patient, like the plaintiff, was diagnosed with cancer. Id. The court explained that because, the trial court had not defined the word “agent,” the jury could have erroneously considered the defendant-doctor to be an agent of the defendant-hospital. Id.
After concluding that the trial court had erred in denying the defendant-hospital’s requested instruction, the supreme court, under the sub-heading of “Harm,” concluded that the harm analysis of rule 61.1(b) “applies ... because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor’s] acts or 'omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so.” Id. at 865.
In the instant case, the panel majority cites Hawley for the following proposition:
If one of the plaintiffs legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a Casteel-type charge error. See Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 863-65 (Tex.2009) (broad-form negligence question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury imper-missibly found hospital liable for acts of doctor, where .evidence raised that possibility).
(Emphasis added.) The panel majority’s characterization, in its published opinion on the merits, of Hawley is flat wrong.
In fact, the 'supreme court in Hawley expressly ’ agreed with the plaintiff that “the harm question presented in Casteel is different from that presented here because here the charge did not submit an invalid theory to the jury.” 284 S.W.3d at 865 (emphasis added). It noted that submission of an invalid theory involves a trial court’s error in instructing a jury to consider erroneous matters and the defendant-hospital “d[id] not contend that the jury was allowed to consider an improper theory of liability by the charge that allowed the hospital to be held liable for actions of its agents.” Id. The court explained, thus,
[T]he presumed harm analysis of Rule '61.1(b) was applied in Casteel and Harris County to a different jury charge problem than is presented here. See Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 756 (Tex.2006) (“We specifically limited our holdings in Casteel and Harris County to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements.”).
Id. Even though the court considered Casteel inapplicable, it did apply the harm analysis of rule 61.1(b) in Hawley “because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor’s] acts or omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so.” Id. In doing so, the court made sure to note that “in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an *735 improper judgment.”[14] Id.;- see also Tex. R.App. P. 61.1(a).
In Morrison, the supreme court, following its precedent in Casteel, held that because the broad-form liability question submitted to the jury by the trial court “allowed liability for ‘adverse personnel actions’ the- jury could have improperly found liability based upon [a] denied promotion,” which constituted an invalid theory of liability. 381 S.W.3d at 537 (emphasis added).. Prior to filing her suit against the defendant-employer for retaliation, the plaintiff-employee, in Morrison, filed a charge of discrimination with the Equal Employment Opportunity Commission (“EEOC”), which is a prerequisite to suit against a government entity like the defendant-employer. Id. at 535-37 (citing Tex. Gov’t Code Ann. §' 311.034 (Vernon 2013)). The plaintiffs EEOC complaint “included several bases for discrimination,” but not the denied promotion. Id. at 535.
The. trial court did not define “adverse personnel actions” in the jury charge, and the defendant specifically objected, arguing. that the trial court’s use of the term “adverse personnel actions” would “allow the, jury to find liability without unanimity because there were multiple occurrences the jury could view as adverse personnel actions.” Id. The defendant then “tendered a liability question that focused solely on the termination,” but the trial court denied the request. Id. In reaching its holding, the supreme court explained that because the trial court submitted the liability question in a way that “prevent[ed] [the] parties [and] the Court from knowing for certain what theory the jurors relied upon,” the defendant was “prohibited from demonstrating on appeal that the jury’s verdict was based upon the invalid legal theory.” Id. at 537. In other words, the supreme court “presumed” harm as it did in Casteel. Id. at 534, 536, 538.
Hére, unlike, in Casteel and Morrison, the trial court simply did not in its charge to the jury submit a single broad-form liability question that erroneously commingled valid and invalid theories of liability. As previously explained by the supreme court, submission of an invalid theory of liability necessarily involves a trial court’s error in affirmatively instructing a jury to consider erroneous matters. Hawley, 284 S.W.3d at 865. And the supreme court has “specifically limited [its] holdings in Casteel and Harris County to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements.” Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 756 (Tex.2006) (emphasis added).
As in Hawley, the trial court here did in fact deny Dr. Benge’s request for an instruction.[15] He requested that the. trial *736 court instruct the jury:
You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.
Thus,'under the supreme court’s holding and reasoning in Hawley, the panel majority was required, before presuming harm under rule 66.1(b), to determine first whether the trial court had erred in denying Benge his requested instruction. Arid if, and only if, the trial' court erred ⅛ denying this instruction, then, and only then, should the panel have considered whether, from the trial court’s error, harm should be presumed under rule 66.1(b). Hawley, 284 S.W.3d at 865.
First, it should be noted that Dr. Benge, prior to asking for the above instruction for the first time in the charge conference, had already waived any error in regard to Williams’s statements, evidence, and arguments about “informed' consent” or “disclosure.” Although the trial court had initially granted Benge’s 'motion in limine on the topic, and even sustained one of his objections, the record reveals that Benge repeatedly failed to object when he was required to do so. In fact, the record reveals that he made only two objections during the presentation of the evidence and none during Williams’s opening statement and closing argument. And he, himself, extensively testified that he had warned Williams of the' risks and hazards involved in the LAVH and Williams' had “g[iven him] consent to have Dr. Giacobbe participate in the surgery.”[16] At one point, while Williams had her medical expert on direct examination and Benge objected to a question about her lack of consent, the following exchange occurred:
[William]: One other thing, Judge. They Spent a fair amount of time going through the informed consent page with Dr. Benge, and he — they asked him a question, “Did you get proper informed consent?” ‘Yes, I did.” They’ve waived that already.
[Dr. Benge]: Don’t believe we ■ have waived it because we had a running objection at the beginning of the case.
[Williams]: Can’t have a running objection- to your own questions.
[Dr. Benge]: Yeah.
Second, even if Dr. Benge had not waived the issue, the trial court did not err in denying the instruction that he requested. Again, he requested- that the trial court instruct the jury that “in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.”' He did not request that the trial court instruct the jury to consider such evidence only in determining his credibility and for no other purpose; thus, his proposed instruction was overbroad. Because *737 the complained-of evidence directly concerned the issue of Benge’s credibility and the evidence showed that he believed that an “electrical arc from [a] Bovie” had caused Williams’s injuries, the jury was entitled to consider any evidence of his “deceitfuljness]” in deciding whether to reject his explanation of causation. And, again, Williams certainly had the right to refute Benge’s testimony that she had in fact “g[iven him] consent to have Dr. Gia-cobbe participate in the surgery,” which also served to. impeach his credibility. Thus, Benge’s requested instruction, as written, would have misled the jury into thinking that it could not consider the complained-of , evidence to assess his credibility for determining the ultimate issue in the case.
Third, even if the trial court had erred in denying Dr. Benge his requested instruction, this is not a case where harm should be presumed under rule 66.1(b), as it was in Hawley. Again, as explained by the Texas Supreme Court, “in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment.” Hawley, 284 S.W.3d at 865; see also Tex.R.App. P. 61.1(a). Rule 61.1(b) does not apply here because the jury could not, as asserted by the panel majority in its characterization of Williams’s case, have found Benge liable based on a theory that he “negligently failed to provide that information to Williams before the operation.” (Emphasis added.)
Again, Williams simply did not assert that Dr. Benge had “negligently failed” to inform her that Dr. Giacobbe “was going to perform a substantial portion of the surgery.” Rather, she pulled no punches and directly accused Benge of being intentionally “deceitful” and unethical, citing his violation of the AMA’s Code of Medical Ethics. And she expressly, and in no uncertain terms, stated 'that his testimony that she had 'actually “g[iven him] consent to have Dr. Giacobbe participate in the surgery” was false. Thus, to the extent that the panel majority, in characterizing the “theme” of Williams’s case, relies on Dr. Patsner’s testimony that Dr. Benge’s “betrayal” in not “explain[ing] who was doing the surgery on Ms. Williams” was “outside the standard,” it errs.
Finally, it should be noted’that because Dr. Benge has conflated Casteel-type submission error,' where harm is presumed, with error regarding the denial of a requested instruction, wheré error is most often not presumed, Benge, in his appellant’s brief, did not present this Court with a harm analysis as required. See Tex. R.App. P. 38.1(i). •
In sum, the panel majority, in "characterizing Williams’s casé for her, sets up the straw man that she “effectively” presented to the jury' an “unpleaded informed consent theory” and asked it to find that Dr. Benge “negligently failed” to inform her that he intended to use “an inexperienced resident” “to perform a substantial portion of the surgery.” It then knocks down the straw man, holding that the trial court’s “broad form negligence question effectively included an informed consent issue and therefore violated Casteel.” In reaching this holding, the panel majority not only misinterprets.^ Casteel and Morrison, but conflates “Casteel-type charge error,” i.e., error involving a trial court’s submission of multiple theories of liability, with error involving the denial of a requested instruction.
More important; in doing so, the panel majority, in its published opinion on the merits,, disregards the Texas Supreme Court’s actual holding in Hawley, misehar-acterizes the court’s opinion as relying upon Casteel in presuming harm, despite the fact that it expressly states that Cas-teel is "“different,” and then cites Hawley *738 in support of its holding. See Hawley, 284 S.W.8d at 865. In doing so, the panel extends the holding of Casteel regarding presumption of harm in cases involving the erroneous submission of multiple liability theories to cases involving the denial of a requested instruction. And the panel majority does this in spite of the fact that the supreme court in Hawley expressly stated, “in most cases v^here a trial.court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment.”[17] Id.; see also Tex.R.App. P. 61.1(a).
Here, the panel majority reverses the trial court’s lawful judgment entered in favor of Williams, not on a legitimate legal point of error, but upon a wholly manufactured appellate issue. In doing so, the panel majority not only wrongfully deprives Williams of her lawfully rendered verdict and judgment, it also unnecessarily places upon her the burden of yet more expense and delay in securing justice. And because the panel majority misapplies the holdings and reasoning of the Texas Supreme Court in Casteel, Hawley, and Morrison, the panel majority’s error is of such magnitude that it should be corrected by this court sitting en banc or by our high court. See Tex.R.App. P. 41.2(c) (“[E]x-traordinary circumstances require en banc consideration.”); Tex. Gov’t Code Ann. § 22.001(a)(6) (Vernon 2004) (“The supreme court has jurisdiction [when] ... it appears that an error of law has been committed by the court of appeals.”).
Conclusion
This case serves as a cautionary tale and illustrates the dangers encountered when courts engage in deciding cases ad hoc and not in accord with established precedent. Such decision making, not only unnecessarily adds time and expense to the disposition of a case, doing a disservice to the litigants, but also undermines the rule of law. If the rule of law means anything, it means that judges are bound to follow well-established and sound legal precedent. Although we, as intermediate appellate court justices, are certainly free to point out any flaws in the reasoning of the opinions of our high courts, we are not free to disregard binding precedent.
Why in Texas are the rights to public justice and civil trial by jury vanishing? Some might reasonably argue that these rights are, to a large extent, vanishing because of the acts and omissions of our courts — the very same entities that were created to serve and maintain them. The problem is not new. • In making the case for reform of the Court of Chancery in nineteenth century England, Charles Dickens, in Bleak House, wrote:
This is the Court of Chanery; ... which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honorable man among its practitioners who would not give — who does not often give — the warning, “Suffer any wrong that can be done to you, rather than come here!”[18]
*739 As illustrated by Dickens’s tale, if we, as lawyers and judges in the year 2015, want to preserve and protect the 800-year-old legacy of Magna Carta, we must be ever vigilant in the performance of our duties as stewards and “guardians of the law.”[19] If we fail in fulfilling these critical duties, not only will we ultimately ■ render ourselves irrelevant, but the rule of law, guaranteed by Magna Carta, will become a mere memory. Thus, our profession should address Chief Justice Hecht’s concern about the vanishing jury trial and answer State Bar President. Apffel’s call to action to “stand[ ] firm for equal access to justice” and educate the public that “the right to trial by jury is the very foundation of our liberties and freedoms.”[20] We should, in the words of President Lincoln, re-dedicate and “take increased devotion to”[21] our solemn duties to protect the rule of law.
And if we, on the bench and in the bar, really want to provide real access to civil justice for all, preserve the civil right to trial by jury, and maintain the rule of law, we should, first and foremost, not deprive a party of justice by taking from her a lawfully-obtained judgment. Like good doctors, we should first do no harm.

. 388 S.W.3d 656 (Tex.2012).

. 22 S.W.3d 378, 389 (Tex.2000) (holding that when single broad-form liability question erroneously commingles valid and invalid liability theories and appellant's objection is timely and specific, error is harmful when appellate court cannot determine whether improperly submitted theories formed sole basis for jury’s finding).

. Even under the harmless-error test, Dr. Benge has established the requisite harm for reversal based on the repeated references throughout the trial to a violation of the standard of care by failing to disclose the resident’s participation.

. Thus, the trial court would not have been required to submit granulated liability questions, contrary to the preference for broad-form questions established in Rule 277. See Tex.R. Civ. P. 277.

. Trey Apffel, President’s Opinion: Protecting the Right to Trial by Jury, 78 Tex. B.J. 194, 194 (2015).

. Magna Carta, ch. 17, in A.E. Dick Howard, Magna Carta: Text & Commentary 41 (1964).

. Id. ch. 38, at 45.

. ' Id. ch. 40, at 45 ("To no one will We sell, to none will We deny or delay, right or jus- ' tice.”).

. Id. ch. 45, at 47.

. Id. ch. 39, at 45.

. Tracy Walters McCormack & Christopher Bodnar, Honesty is the Best Policy: It’s Time to Disclose Lack of Jury Trial Experience, 78 Tex. B.J. 210, 210 (2015).

. Angela Morris, Why are Filings Falling? Civil Lawsuits Down 17 Percent in 10 Years, Tex. Law., Mar, 9, 2015, available at http:// www.texaslawyer..com/id= 1202719819524/ Why-Are-Filings-Falling-CivilLawsuits-Down-17-Percent-in-10-Years. Filings-Falling-CivilLawsuits-Down-17-Percent-m-10-Years.

. As expressly explained by then Justice Hecht, when a health care liability claim is "not based on a failure to disclose the risks of [a] 'medical care or surgical procedure,’ " section 74.101 does not apply. Felton v. Lovett, 388 S.W.3d 656, 660 (Tex.2012). And, "when [s]ection 74.101 does not apply, the common law does.” Id. Moreover, "Section 74.101 does not purport to affect the common law in cases other than those the statute covers, and nothing in the [statute] suggests a different intent.” Id. at n. 10 (emphasis added) ("Whether a stathte modifies or abrogates the’ common law depends on legislative intent.” (citing Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc., 236 S.W.3d 190, 194 (Tex.2007))).
Contrary to this reasoning, the panel majority claims that section 74.101 is part of "a comprehensive statutory scheme concerning disclosure and informed consent law.” And the panel majority goes further astray, holding that "Texas law does not impose a legal duty to disclose to a patient specific information about a consented-to assisting surgeon’s anticipated level of participation or experience.” In support of this seminal and extraordinary holding, the panel majority relies on "the analysis” in Haynes v. Beceiro, 219 S.W.3d 24 (Tex.App.—San Antonio 2006, pet. denied).
Not only is the panel majority’s interpretátion of section 74.101 inconsistent with that of the Texas Supreme Court’s interpretation, as expressly stated in Felton, but the analysis of the court in Haynes is simply not applicable in the instant case. In Haynes, the court held that the "battery claim” of Haynes, the plaintiff-patient, against Dr. Beceiro, an assisting surgeon, was precluded because Haynes had actually consented to Beceiro performing surgery on her. 219 S.W.3d at 26-27.
Here, in contrast, Williams has not sought to hold Dr. Giacobbe liable for “battery” or under any other liability theory. And she at no time has ever sought to hold Dr. Benge liable for any "battery” committed against her by Giacobbe. Indeed, the panel majority’s reliance on Haynes reveals its fundamental mischaracterization of Williams’s actual liability claims, which concern only Benge's negligence as a surgeon and supervisor of Giacobbe.
Thus, the premises upon which the panel majority relies do not support its extraordinary holding. And, as demonstrated below, the ultimate issue answered by the panel majority is not even properly before this Court.

. Contrary to the panel majority's assertion, both parties stated at trial that this is "not an informed-consent case.” As Williams’s counsel explained to the trial court, “It's a negligence case.”

. Am. Med, Ass'n, Council on Ethical and Judicial Affairs, Code of Medical Ethics, . Current Opinions: Opinion 8.16-Substitution of Surgeon without Patient’s Knowledge or Consent (1994), available at http:/Avww.ama-assn.org/ama/ pub/physician-resources/medical-ethics/code-medicical-ethics/opinion816 .page (emphasis added). Opinion 8.16 — Substitution of Surgeon without Patient’s Knowledge or Consent, provides:
A surgeon who allows a substitute to operate on his or her patient without the patient's knowledge and consent is deceitful. The patient is entitled to choose his or her own physician and should be permitted to acquiesce to or refuse the substitution. The surgeon’s obligation to the patient requires the surgeon to perform the surgical operation: (1) within the scope of authority granted by the consent tó the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of facts relevant to the need and the performance of the operation; and (4) utilizing-best skill.
It should be noted that it is the operating surgeon to whom the patient.grants qonsent to perform the operation. The patient is entitled to the services of the particular surgeon with whom he or she contracts. The operating surgeon, in accepting the patient, is obligated to utilize his or her personal talents in the performance of the operation, to the extent required by the agreement creating the physician-patient relationship. The surgeon cannot properly delegate to another the duties which he or she is required to perform personally.
Under the normal and customary arrangement with patients, and with reference to the usual form of consent to operation, the operating surgeon is obligated to perform the ’ operation but may be assisted by residents or other surgeons. With the consent of the patient,.it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, ie, the surgeon must scrub. • If a resident or other physician is to perform the operation under non-participatoiy supervision, it is necessáry to make a full disclosure of this fact to the patient', and this should be evidenced by an appropriate statement contained in the consent. Under these circumstances, it is the resident or other physician who becomes the operating surgeon. (I, II, IV, V). '
Id. (emphasis added).

. See Tex. Penal Code Ann. § 31.01(1) (Vernon Supp.2014) (providing multiple definitions of “deception,” including “promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed” and'“ereating or con- , firming by-words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true”); Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC, 324 S.W.3d 840, 850 (Tex.App.—Houston [14th Disti] 2010, no pet.) (iisting, as an element of "fraud by nondisclosure,” “the defendant failed to disclose facts to the plaintiff”); see also Black’s law Dictionary 492 (10th ed. 2009) (defining "deception” as "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false”); id. at 491 (defining *733 "deceit" as “[t]he act of intentionally leading someone to believe something that is not true”).

. In stark contrast to. the Texas Supreme Court's holding in Casteel, the Texas Court of Criminal Appeals, in affirming judgments imposing the death penalty in two separate capital-murder cases, held that where a "trial court’s charge authorize[s] [a] jury to convict on alternative theories, the .verdict of guilt will be upheld if the evidence [is] sufficient on any one of the theories. Sorto v. State, 173 S.W.3d 469, 472 (Tex.Crim.App.2005) (emphasis added) (citing Rabbani v. State, 847 S.W.2d 555, 558-59 (Tex.Crim.App.1992)).

. In its "Supplemental Opinion,” the panel majority appears to recognize that the supreme court in Hawley actually addressed “jury-instruction error.” However, the panel majority, unlike the supreme court in Hawley, does not address the issue of whether the trial court actually erred in denying Dr. Benge’s requested instruction. Instead, it continues to presume error, and that it was preserved, , and then it presumes harm. And the panel majority’s published opinion, which mischar-acterizes Hawley as a case involving "Casteel-type charge error” and a "broad-form negligence question,” has not been withdrawn and still stands. See Tex.R.App. P. 47.7 cmt. ("All opinions and memorandum opinions in civil cases issued after the 2003 amendment have precedential value.”); see also First Gibraltar Bank, FSB v. Christian, No. 14-94-01212-CV, 1995 WL 645120, at *1 (Tex.App.—Houston [14th Dist.] Nov. 2, 1995, writ denied) (not designated for publication) ("[Published opinions setting forth the analysis and decisions of federal and state courts ... constitute legal authority or precedent.”).

. In its "Supplemental Opinion,” the panel majority, continuing in its erroneous reliance on Casteel, asserts that the error in this case "was not simply the denial of Dr. Benge's proposed instruction,” but rather "also the submission ... of a single broad-form jury *736 question that mixed a valid and invalid,theory.” However, the panel majority never actually addresses, in either its published opinion or “Supplemental .Opinion,” whether the trial court erroneously denied Benge’s proposed instruction or whether he preserved such error for our review. Notably, Benge, in his appellant's brief, expressly states that "[t]he trial court erred when it refused [his] request for an instruction in the charge clarifying that the jury could not find [him] liable on th[e] informed-consent ground.”

. Dr. Benge, at the beginning of trial, requested "a running objection to the questions about informed consent,” which the trial court granted, although it cautioned, "I will tell you I’m not sure if it holds water when we get to the appellate level.” Benge’s "running objection” became null, however, when he, himself, testified about "informed consent.” See Bay Area Healthcare Grp., Ltd. v. McShane, 239 S.W.3d 231, 235 (Tex.2007) (error in admission of evidence waived if objecting party permits same or similar evidence to be introduced without objection).

. After again presuming harm, after first presuming error, in its "Supplemental Opinion,” the panel majority asserts that "[t]here were easy solutions” to correct the trial court’s error, such as “narrowing the [jury] question to inquire about negligence during or after the surgery or an instruction that a failure to disclose could not form the basis for a finding of negligence.” However, Dr. Benge did not ask for either of these remedies, instead he merely requested an overly broad jury instruction, which the trial court would.have erred in submitting. See. Fibreboard Corp. v. Pool, 813 S.W.2d 658, 670 (Tex.App.—Texarkana 1991, writ denied) (concluding instruction "overly broad” where it would have prevented jury from considering evidence for valid purposes).

. Charles Dickens, Bleak House 13 (Stephen Gill ed., Oxford Univ. Press 2008) (1853).

. See Tex. Disciplinary Rules Prof’l Conduct preamble ¶ 1, reprinted in Tex, Gov't Code Ann., tit. 2, subtit. G, app. A (Vernon 2013). For example, in order for our adversarial system to function properly, lawyers, in zealously representing their clients, must always be mindful of their duties to disclose to courts controlling authority "adverse to the position" of their client, not “make a false statement of material fact or law to a [court],” and not "take a position that unreasonably increases the costs or other burdens of the case or that unreasonably delays resolution of [a] matter.” Id. at R. 3.02, 3.03(a)(1), (a)(4). And judges, as neutral referees, must always "comply with the law” and "accord to every person who has a legal interest in a proceeding, or that person’s lawyer, the right to be heard according to law.” Tex.Code Jud. Conduct, Canons 2(A), 3(B)(8), reprinted in Tex. Gov’t Code Ann., tit. 2, subtit. G, app; B (Vernon 2013).

. Apffel, supra note 1, at 194; Morris, supra note 8.

. Abraham Lincoln, Address at the Dedication of the Cemetery at the Gettysburg, Pennsylvania (November 19, 1863), reprinted in Abraham Lincoln: The Gettysburg Address and Other Speeches 82 (1995).